BARBARA COULTER and TED V. COULTER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Coulter v. Commissioner
Docket Nos. 30098-82, 22747-84, 30099-82, 22748-84, 30100-82, 22749-84.
United States Tax Court
T.C. Memo 1987-121; 1987 Tax Ct. Memo LEXIS 117; 53 T.C.M. (CCH) 298; T.C.M. (RIA) 87121; March 4, 1987. Jon M. Wagner,Chris M. Goodrich, and Lionel M. Schooler, for the petitioners. Sheri Wilcox and David W. Johnson, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: In these consolidated cases, respondent determined deficiencies in and additions to petitioners' Federal income taxes as follows: Additions to Tax
[1] Pursuant to Sections Petitioner
Docket No.
Year
Deficiency
6651(a)
6653(a)
6653(b)
6654
Ted V.
Coulter
22749-84
1973
$4,098
$2,049
22749-84
1974
56,632
28,316
22749-84
1975
96,197
55,442
22748-84
1976
55,652
27,826
$2,016
22747-84
1977
2,049
$102
22747-84
1979
6,631
$858
332
99
22747-84
1980
4,957
941
248
207
Barbara
Coulter
30098-82
1973
4,098
30098-82
1974
56,632
30098-82
1975
96,197
30099-82
1976
55,391
13,545
2,770
2,007
30100-82
1977
2,049
102
30100-82
1979
7,201
800
360
122
30100-82
1980
4,957
941
248
207
*119 After concessions, these issues remain for decision: (1) The amount of the deficiencies in petitioners' income taxes for the years 1973 through 1977 and for 1979 and 1980; (2) Whether petitioner Ted Coulter is liable for additions to tax under section 6653(b) for the years 1973 through 1976; (3) Whether both petitioners are liable for additions to tax under section 6651(a) for the years 1974 through 1976 and for 1979 and 1980 and for additions to tax under section 6653(a) for the years 1974 through 1977 and for 1979 and 1980; (4) Whether both petitioners are liable for additions to tax under section 6654 for the years 1976, 1979, and 1980; (5) Whether the assessment and collection of the deficiencies and additions to tax for the years 1973 through 1975 are barred by the statute of limitations; and (6) Whether petitioner Barbara Coulter is entitled to relief as an "innocent spouse" under section 6013(e) for the years 1973 *120 through 1975. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by reference. Petitioners, Ted V. and Barbara Coulter ("Mr. and Mrs. Coulter"), husband and wife, resided in Houston, Texas at the time the petitions herein were filed and during all of the years at issue. The Flower Shop
From 1973 to 1980, Mr. Coulter as a sole proprietor owned and operated in Houston a retail flower business known as ABC Flower Shop ("ABC"). The business consisted of one store on Fannin Street (the "Fannin store"), and from 1973 until early 1975, a second store on Westheimer Road (the "Westheimer store"). In addition, ABC operated Christmas tree lots during November and December of each year and sold flowers through the gift shops of several local hospitals. At least a portion of the receipts from all parts of the business were commingled in one account at the Bank of Houston. The Fannin store was managed by Mr. Coulter, with Mrs. Coulter working as a clerk in the store until sometime in 1974. Separate records were kept for the Fannin store, and these records included the income *121 and expenses of the Fannin store, as well as the expenses of the hospital sales. These records were maintained by petitioners with supervision from Bookkeepers Business Service Company ("BBS"). BBS provided petitioners with a form called a daily sales record, which petitioners used to record the daily total of sales rung up on the cash register at the Fannin store. An employee of BBS came to the Fannin store twice a month to pick up the daily sales records and the invoices for expenses incurred since the last pick-up. Then, on a monthly basis BBS prepared a profit or loss statement showing the result of the Fannin store's operations for the year-to-date. At the end of each year BBS used these statements in preparation of petitioners' tax returns. Before preparing the returns, however, BBS gave petitioners forms called "Schedule C change sheets" to be used to augment the information on the monthly statements. The Westheimer store was operated by petitioners' sons, John and Brett. The records of the Westheimer store were kept by Connie Coulter, Brett's wife, who also operated the cash register for a period of time. Connie recorded the Westheimer store's sales in one journal *122 and its expenses in another. The sales journal contained several columns, one of which indicated the sales rung up for a given day (the "register column") and another of which indicated the cash, checks, and charge receipts placed in the register (the "total column"). The totals of these columns were not always the same because of overrings and sales which were not rung up. The Westheimer store initially was operated as part of the sole proprietorship, but on January 31, 1975, it was incorporated as ABC Flowers, Inc. On that date, Mr. Coulter transferred to the new corporation assets having a total fair market value of $74,899.81 and a total adjusted basis of $59,789.00. The assets included inventory, trucks, and cash registers. In exchange for the assets, the corporation issued to Mr. Coulter 49,000 shares of stock and to Brett 51,000 shares of stock. The stock had a par value of $ .10 per share. The corporation's general ledger for the fiscal year ended January 31, 1976, reflected a credit to an account titled "Due To/From Ted V. Coulter" in the amount of $74,899.81. This credit was offset by part of a sales journal debit dated February 1975 in the amount of $78,417.69. *123 The Christmas tree lots were run by petitioners, with help at different times from Brett, John, and Connie, as well as part-time employees. The income and all the expenses except commissions for the lots were recorded in one journal, and the commissions were recorded in another journal. The final part of the ABC business consisted of the sale of flowers to hospital gift shops. Petitioners did not keep a record of the income from such sales, but the cost of the flowers and the expenses associated with their sale were included in the records of the Fannin store. Other Investments
In addition to owning the flower business, Mr. Coulter was a partner in a partnership that owned J&J Greenhouses. The other partners were John and a third person. In 1975 and 1976, Mr. Coulter and Brett each invested $27,000 in an oil and gas joint venture with payments made by ABC Flowers, Inc. After the payments were made, Mr. Coulter never heard anything or received any money from the venture's promoter. Finally, Mr. Coulter was involved in substantial trading in stocks and bonds during some of the years under consideration. Petitioners' Returns and Financial Statements
*124 Petitioners filed joint returns for the years 1973, 1974, and 1975. They did not file any returns for the years 1976 to 1980. The 1974 return was filed a year and a half late, and the 1975 return was filed several months late. Each of the returns was prepared by BBS, using the information from the profit and loss statements and the Schedule C change sheets. For 1973, petitioners reported on their return taxable gross receipts from ABC totaling $256,653. The profit or loss statement for December 1973 prepared by BBS from the daily sales records of the Fannin store reflected gross receipts for the year, prior to any year-end modifications, of $155,453. On the Schedule C change sheet signed by Mr. Coulter for 1973, petitioners listed receipts from "Trees" of $101,200. The Schedule C change sheet also listed "Sales from other store" of $80,705.22, but this figure was crossed out. Thus, the gross receipts reported by petitioners in 1973 were comprised of the receipts from the Fannin store and the Christmas trees. Petitioners' return for 1973 did not contain any receipts from the Westheimer store or the sale of flowers to the hospital gift shops. However, in or about October *125 1973, Mr. Coulter submitted a signed financial statement to the Bank of Houston for the purpose of qualifying for credit. On that statement, Mr. Coulter represented that as of October 23, 1973, ABC's gross sales less returns for the year 1973 were $458,455 or about $200,000 more than was reported to respondent for the year. For 1974, petitioners reported on their return taxable gross receipts from ABC totaling $245,731. The profit or loss statement for ABC through November of 1974 prepared by BBS reflected gross sales from the Fannin store of $157,259.20. The daily sales records for December 1974 reflected gross sales in that month of $17,026.24. The 1974 Schedule C change sheet signed by Mr. Coulter listed receipts from "Christmas trees" of $72,000. Thus, the gross receipts reported by petitioners in 1974 were comprised of the receipts from the Fannin store and the Christmas trees. The 1974 return did not contain any receipts from the Westheimer store or the sale of flowers to the hospital gift shops. However, around November 1974, Mr. Coulter submitted another signed financial statement to the Bank of Houston on which he stated that as of November 27, 1974, ABC's gross sales *126 less returns for 1974 were $868,596 or about $600,000 more than was reported to respondent for the year. For 1975, petitioners reported on their return taxable gross receipts from ABC totaling $213,839. These receipts were comprised solely of the receipts from the Fannin store, as shown by its profit or loss statement for December 1975. There was no Schedule C change sheet for 1975. The 1975 return did not reflect any receipts from the sale of Christmas trees or flowers to the gift shops. However in 1975, Mr. Coulter submitted a third financial statement to the Bank of Houston, in which he represented that as of December 31, 1975, ABC's gross sales less returns for 1975 were $530,245 or about $300,000 more than was reported to respondent for the year. Respondent's Determinations
Respondent began his examination of petitioners in 1977. At that time petitioners were requested by respondent's agent to provide the books and records supporting their tax returns for the years 1973 through 1975. Mr. Coulter responded by providing the records of the Fannin store, but no records for the Westheimer store, Christmas tree lots, or hospital sales. The revenue agent subsequently *127 learned of the existence of these possible sources of income from licenses issued to Mr. Coulter by the Department of Agriculture. When confronted with the licenses Mr. Coulter turned over to the agent records reflecting receipts from the Westheimer store, the sale of trees and the sale of flowers to the gift shops. With these records respondent determined that petitioners had income tax deficiencies for the years 1973 through 1977 as well as for 1979 and 1980. He also determined that they had a net operating loss for 1978. Since no returns were filed for 1976 through 1980, respondent pursuant to community property laws of Texas, attributed one half of the combined income to each petitioner and issued separate notices of deficiency for those years. In support of the deficiencies asserted for the years 1973 through 1976, respondent determined the taxable gross receipts and deductible expenses for each part of ABC. With respect to the Fannin store, respondent concluded that the gross receipts were $155,610.42 in 1973, $174,244.46 in 1974, $213,870.15 in 1975 and $222,366.66 in 1976. Respondent computed the gross receipts for 1973 to 1975 by totaling the entries on the daily sales *128 records and computed the gross receipts for 1976 by taking the year end sales figure from the profit or loss statement for that year. Respondent used the same sources to determine the expenses, including purchases and labor, of the Fannin store for 1973 through 1976. With respect to the Westheimer store, respondent determined that the gross receipts from such store were $146,436.02 for 1973, $570,039.40 for 1974, and $49,202.18 for 1975. [2] Respondent relied on the Westheimer store's sales journal to compute these figures, but used the larger figure from either the register column or the total column for each day. Respondent computed the expenses of the Westheimer store expenses from the store's expense journal. Respondent also determined that petitioners realized income of $23,528.69 at the time the Westheimer store was incorporated. [3]
*129 With respect to the Christmas tree lots, respondent determined that the gross receipts from the lots were $105,511.35 for 1973, $135,794.89 for 1974, $130,019.31 for 1975, and $120,539.20 for 1976. He computed the gross receipts for 1973, 1974, and 1975 by totaling the entries in the Christmas tree income and expense journal. For 1976 respondent computed the gross receipts from the amount of commissions paid to the salespeople as reflected in the commissions journal because respondent concluded that the income figures in the journal were too low. Respondent determined the expenses of the tree lots for all years from the income and expense journal and the commissions journal. With respect to the hospital sales, respondent determined that the gross receipts from such sales were $45,930.14 for 1973, $53,859.55 for 1974, $57,939.86 for 1975, and $57,019.82 for 1976. Respondent computed these gross receipts from copies of the hospital checks used to pay ABC. The expenses for these sales were included in the Fannin store expenses. With respect to petitioners' other sources of income, the parties have stipulated as to all issues except the amount of income or loss from J&J Greenhouses *130 in 1977 and the amount of any loss from the oil and gas venture. OPINION 1. Amount of Deficiencies
Respondent determined that petitioners had income tax deficiencies in each year from 1973 through 1980, with the exception of 1978. Petitioners have the burden of proving that respondent's determination is erroneous. ; Rule 142(a). Although the parties have reached agreement on several issues with respect to the deficiencies, petitioners contend that respondent's determination still contains some errors. We will discuss each alleged error independently. a. Gross receipts
Petitioners dispute on several grounds the amount of ABC's gross receipts as computed by respondent. First, they contend that the Westheimer store was not part of the ABC proprietorship, but instead was a partnership comprised of Mr. Coulter and the two sons Brett, and John. However, the only evidence presented by petitioners on this argument was the vague, inconclusive, and sometimes contradictory testimony of petitioners and John. Furthermore, from the record as a whole it is apparent that no partnership agreement was ever drawn up, *131 no partnership return was ever filed, Brett and John received only salaries and did not share in the profits, and all of the assets of the Westheimer store were owned by Mr. Coulter. Consequently, we are unable to find that a partnership existed. Petitioners also claim that the gross receipts of the Westheimer store were overstated because, as we have found, respondent took for each day the higher figure reflected in the register column or the total column of the sales journal for that store. We agree with petitioners that there is no justification for selecting the higher figure from both columns which was apparently done by the agent in order to obtain the greatest possible amount of gross receipts. From the record before us we conclude that the gross receipts for each day should be taken from the register column. However, in the event that there is no entry in such column for a given day, then the figure, if any, in the total column should be used. b. Expenses
Petitioners claim that the expenses, including purchases and labor, of the various parts of the ABC operation were understated by respondent. The major area of dispute is the cost of flowers, Christmas trees, *132 and other inventory purchased by ABC for resale. The figures used by respondent for the purchases, as well as all the other expenses discussed below, were taken from petitioners' own books and records. In an attempt to refute these figures petitioners produced at trial several boxes of receipts, invoices, and other documents, together with a summary, which petitioners claim shows that respondent's figures are too low. However, from the record before us we are unable to determine the accuracy of the summary or which of the documents can be relied upon to refute respondent's determination. Nevertheless, from these documents and from respondent's own computations we are satisfied that petitioners made additional purchases of Christmas trees of at least $15,000 in 1974 and $5,000 in 1976 [4] and additional purchases for the Fannin Store of at least $55,000 in 1975 and $60,000 in 1976. See . At trial and on brief petitioners also claimed additional labor expenses. They argue that in 1974 they paid $10,800 in wages to an employee *133 at the Fannin store which respondent failed to include in his computation. However, petitioners have failed to show that these wages were not included by respondent in the labor expenses which were allowed for the Fannin store. In addition, petitioners assert that the labor expenses allowed by respondent for the Christmas tree lots for 1974 to 1976, are obviously too low when compared with the same expenses for the tree lots in 1972 and 1973. We are not persuaded by petitioners' analysis and find that this is not a sufficient reason to deviate from respondent's figures which are supported by petitioners' own books. Petitioners next claim that ABC's operating expenses were higher than those allowed by respondent. Once again, we are unable to find from the record that respondent's figures are not substantially accurate. The final group of expenses or adjustments to gross receipts which are in dispute relate to bad checks, bank card service fees, and state sales taxes collected by petitioners from customers. Petitioners contend that these items are not expenses but rather "adjustments to gross receipts" which respondent failed to include in his computation. While we agree that *134 at least the sales taxes were more properly classified as petitioners suggest, we are unable to find that any of these items were not in fact included along with the other expenses reflected in their books and records and allowed by respondent. [5] For example, the sales taxes collected at the Fannin store were deducted from that store's gross receipts on its profit or loss statements, and the sales taxes collected at the Westheimer store and the Christmas tree lots were recorded as expenses on petitioners' records and allowed as such by respondent. c. Oil and Gas Venture
Petitioners claim that the payments totaling $27,000 made in 1975 and 1976 by ABC Flowers, Inc. to the joint venture on behalf of Mr. Coulter could not be considered constructive dividends because the corporation had no earnings and profits for those years. This argument is contrary to petitioners' stipulation that the payments constituted dividend income and, therefore, cannot be accepted. Petitioners next assert that they are entitled to a loss in 1977 for the $27,000. *135 We agree, and conclude that they are entitled to a capital loss in that amount for 1977 because even though the record contains little proof on this issue, it is clear that up to the date of trial petitioners had received no return of their investment and that it had become worthless by 1977. [6]
d. J&J Greenhouses
Petitioners claim that they are entitled to a loss of $1,666 in 1977 as a result of Mr. Coulter's interest in the partnership owning J&J Greenhouses but they have offered no convincing evidence in support of the argument and it is not accepted. e. Net Operating Loss Carrybacks
The only other dispute with respect to the deficiencies asserted by respondent concerns net operating loss carryovers and carrybacks. On their 1975 return, petitioners claimed operating loss carryovers from 1973 and 1974, but as redetermined herein their income and expenses for 1973 and 1974 do not reflect operating losses. Petitioners, however, did incur a net operating loss of $13,361 in 1978, which may be carried to other years after appropriate adjustments including the stipulated amounts of wages *136 earned by Mrs. Coulter in 1978 as well as the income of Mr. Coulter from J&J Greenhouses. 2. Addition to Tax Under Section 6653(b)
Respondent contends that Mr. Coulter is liable for the additions to tax for fraud under section 6653(b) for the years 1973 through 1976. On this issue respondent has the burden of proving by clear and convincing evidence that there was some underpayment in each year and that some part of the underpayment for each year was due to fraud. Section 7454(a); Rule 142(b). The burden is met if it is shown by such evidence that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. , cert. denied ; , affg. a Memorandum Opinion of this Court; . The presence or absence of fraud is a question of fact to be determined from the entire record. , affd. without *137 published opinion . Fraud is never presumed but must be established by affirmative evidence. . It may, however, be proved by circumstantial evidence because direct proof of the taxpayer's intent is rarely available, and his entire course of conduct may be examined to determine whether the fraudulent intent is present. ; . We find that respondent has presented clear and convincing evidence of Mr. Coulter's intent to evade taxes for each of the years 1973 through 1975. With respect to these years the evidence clearly shows that: (1) Mr. Coulter substantially underreported the gross receipts of ABC in each year; (2) he completely left out the receipts from the Westheimer store and the hospital sales in each year and from the Christmas tree lots in 1975; (3) he was aware in each year that ABC's gross receipts were in excess of those reported on the returns of petitioners, as evidenced by the financial statements submitted by him to the Bank of Houston; *138 and (4) he failed to produce any books or records of the unreported sources of income until respondent's agent had learned of the sources through other means. On behalf of Mr. Coulter, petitioners argue that he relied on BBS to do their returns and that neither he nor Mrs. Coulter paid any attention to the detail on the returns and were not aware that the returns did not contain all of their income. Mr. Coulter may not use BBS to shield him from his responsibilities to file correct returns since we have found that he failed to report to BBS all of ABC's taxable receipts. At most, for 1973 BBS was advised on the change sheet of about half of the receipts of the Westheimer store but the reporting of even these receipts is questionable because the notation was crossed out for some unexplained reason. Petitioners also contend that the returns for the years at issue were not fraudulent because during this period Mr. Coulter was under a great deal of stress because of the opening of the new store on Westheimer Road and the very unfavorable conditions associated with its operation which were caused not only by competitors but also by the increasing illness of Brett. Even though we *139 are convinced that Brett was seriously ill during at least a portion of this period and that there were numerous problems associated with the Westheimer store we are unable to conclude from the record as a whole that Mr. Coulter was unable to comprehend that each of the returns for 1973 through 1975 failed to include a substantial amount of the income of petitioners. After all, during these years he was able to be primarily if not exclusively responsible for the successful operation of ABC and at the same time handle substantial dealings in securities. We are satisfied, therefore, that at least a part of the omission for each of the years 1973 through 1975 is due to his fraudulent intent and that he is liable for the addition to tax provided by section 6653(b) for each of these years. Although we have concluded that the acts set forth above clearly establish that during the years 1973 through 1975 Mr. Coulter consistently followed a pattern designed to evade the payment of the income taxes due from petitioners for those years, we are not convinced from this record that such pattern and the necessary fraudulent intent continued into 1976. In fact with respect to 1976 the only evidence *140 in the record which has a bearing upon his intent is the failure to file a return for that year and the proof of such a failure alone is not sufficient to establish fraud. . Consequently we conclude that with respect to 1976 respondent has failed to establish fraud by clear and convincing evidence and Mr. Coulter is not liable for the addition to tax provided by section 6653(b) for that year. 3. Additions to Tax Under Section 6651(a) and 6653(a)
Respondent claims that both petitioners are liable for additions to tax under section 6651(a) for failure to file timely returns for the years 1976, 1979, and 1980 and the addition to tax for negligence under section 6653(a) for the years 1976, 1977, 1979 and 1980. [7] The addition to tax under section 6651(a) is properly imposed whenever a taxpayer fails to file a timely return unless such failure is due to reasonable cause and not to willful neglect. The addition to tax under section 6653(a) is properly imposed when an underpayment of tax is due to the taxpayer's negligence or intentional disregard of rules or regulations. *141 From this record we are satisfied that petitioners willfully neglected to file returns and to pay their taxes for the years 1976, 1977, 1979 and 1980, and that petitioners' underpayments during the years at issue were due to petitioners' negligence or their intentional disregard of applicable rules. Consequently, we conclude that petitioners are liable for the additions to tax under sections 6651(a) and 6653(a). 4. Addition to Tax for Estimated Tax Underpayments
Respondent's determination that petitioners are liable for additions to tax under section 6654 for 1976, 1979, and 1980 is presumptively correct and petitioners have the burden of proof. Since they have offered no evidence on this issue, respondent's determination is sustained. ; Rule 142(a). 5. Statute of Limitations
Because the deficiency notices for the years 1973 through 1975 were mailed to petitioners after the expiration of the usual three year statute of limitations provided in section 6501(a), we must decide whether any of the extended statutes of limitation in section 6501 apply to these years. Section 6501(c)(1) contains an unlimited *142 statute of limitations whenever a taxpayer has filed a fraudulent return with the intent to evade tax. As we have found above, the returns filed by petitioners for the years 1973 to 1975 were fraudulent and were filed by Mr. Coulter with the intent to evade tax. Therefore, section 6501(c)(1) applies and the assessment for these years may be made at any time. Furthermore, with respect to 1974 and 1975, the six-year statute of limitations provided by section 6501(e) is also applicable because the gross income omitted from the return for each of such years was in excess of 25 percent of the gross income reported. [8]
*143 6. Relief as Innocent Spouse
Mrs. Coulter contends that she is entitled to relief as an "innocent spouse" under section 6013(e) for the years 1973 to 1975. To qualify for such relief she has the burden of proving that: (1) a joint return for each of those years was made on which there was a substantial understatement of tax attributable to grossly erroneous items of Mr. Coulter; (2) in signing the returns, Mrs. Coulter did not know of, and had no reason to know of, the substantial understatements, and (3) taking into consideration all facts and circumstances, it is inequitable to hold her liable for the tax attributable to the substantial understatements. Although there were substantial understatements of tax attributable to the grossly erroneous items of one spouse, in this case, Mrs. Coulter was obviously involved in the ABC business and was aware that income was being earned from both stores, the Christmas tree lots, and the hospital sales. Even if she did not have actual knowledge that the receipts from the Westheimer store and the hospital sales were not being reported, she easily could have determined that the receipts were omitted. See . *144 Furthermore, it is not inequitable to hold her liable for the deficiencies attributable to the omissions since she obviously benefited from the omitted receipts. . We, therefore, conclude that Mrs. Coulter is not entitled to relief under section 6013(e). Decisions will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise indicated. All rule references are to the Tax Court Rules of Practice and Procedure unless otherwise provided.↩
2. This figure includes only sales before the Westheimer store was incorporated on January 31, 1975.↩
3. Respondent computed the income as follows: ↩
Consideration received
Stock (49,000 shares at
$4,900.00
$ .10 par value)
Cash received February 1975
78,417.69
$83,317.69
Less: Adjusted basis of
assets contributed
59,789.00
Income realized
$23,528.69
4. This is in addition to the $13,625.60 concession made by respondent at trial.↩
5. We note that at trial respondent conceded that petitioners are entitled to an additional bad debt deduction of $77.12 for 1976.↩
6. See .↩
7. Respondent also asserted these additions for the years 1974 and 1975 against both petitioners but only as an alternative argument in the event we did not find Mr. Coulter liable for the section 6653(b) addition to tax in those years. Respondent did not assert a section 6651(a) addition to tax for 1977 because the existence of a prepayment credit precluded the application of such section.↩
8. The gross income omitted is computed as follows: Reported Income
1974
1975
Wages, salaries, tips and other
employee compensation
$ 26,400.00
Gross receipts
$245,731.00
213,839.00
Interest
40.00
77.00
Dividends
5,968.00
12,056.00
Capital gains
10,235.00
78,072.00
Gross income stated in return
$261,974.00
$330,444.00
↩
Omitted Income
1974
1975
Gross receipts
$688,237.30
$237,192.50 Dividends
13,895.00 Capital gains
3,049.65
(8,943.79)
Rental receipts
1,000.00
Income on transfer of assets
23,529.00 Total additional undisclosed
income
$692,286.95
$265,672.71